# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

WILLIAM N. LEDFORD,

                Plaintiff,

v.

MICHAEL BAENEN, AMY BASTEN,
RANDY MATTISON, CATHY JESS, YANA
PUSICH, C.O. LEURQUIN, SMA
CONSTRUCTION SERVICES, MIKE
ABHOLD, BURT FEUCHT, and SOCIETY
INSURANCE COMPANY,

                Defendants.

Case No. 16-CV-665-JPS

**ORDER**

Plaintiff William N. Ledford ("Ledford"), a prisoner proceeding *pro se*, filed this action to recover for injuries he allegedly sustained from the discharge of noxious fumes into his cell block during construction of a new shower facility at Green Bay Correctional Institution ("GBCI"). (Docket #55). In his amended complaint, Ledford asserts claims for violations of his constitutional rights under the Eighth Amendment pursuant to 42 U.S.C. § 1983. *Id.* at 16. He also raises claims of negligence, negligent supervision, and negligent infliction of emotional distress under Wisconsin state law. *Id.* at 22–26. The defendants include an array of prison officials (collectively, the "State Defendants"), as well as private individuals and entities associated with the construction work (collectively, the "Construction Defendants").

Before the Court are motions for summary judgment by the State Defendants and the Construction Defendants. (Docket #86 and #94). The

motions are fully briefed.[1] For the reasons stated below, they will be granted and the case will be dismissed.

1.      **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The Court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the [C]ourt that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

_____

[1]Ledford's motion to exceed the page limit under Civ. L. R. 56(b)(8) (Docket #139) will be granted in light of the fact that his submissions are handwritten. His motion to supplement his responsive pleadings with exhibits (Docket #151) will also be granted. The State Defendants' motion to seal an exhibit (Docket #135) will be granted as well.

## 2.   RELEVANT FACTS

The parties' evidentiary submissions in connection with the present motions are massive,[2] but the core operative facts are largely undisputed. In the narrative that follows, disputes concerning the facts will be mentioned only when necessary. Otherwise, the facts are presented in the light most favorable to Ledford.[3]

---

[2]Per the order of Magistrate Judge David E. Jones, to whom this matter was originally assigned, the parties have borrowed evidentiary materials, including documents, discovery responses, and expert reports, from a similar suit brought by another GBCI prisoner, Dwayne Cox, Case No. 15-CV-395-PP (E.D. Wis.), presently pending before another branch of the Court. *See* (Docket #48 and #54 at 4).

[3]A few words about the parties' fact briefing are in order. First, without requesting leave of the Court, the Construction Defendants submitted a supplemental set of proposed material, undisputed facts with their reply. (Docket #162). Such a submission is not authorized by Local Rule 56, and rightly so, as it deprives the non-movant of the ability to challenge the factual assertions therein. Plaintiff moved to strike the document on that basis. (Docket #167). The Construction Defendants responded that the supplemental facts merely reply to the facts asserted in Plaintiff's response, (Docket #168), but this ignores the procedural problem that Plaintiff now has no opportunity to contest the supplemental facts, as fairness dictates he should be allowed to do. His motion to strike the supplemental statements of fact will be granted.

Second, along with his response, Ledford filed a motion for sanctions against the State Defendants. (Docket #147). He argues that they fraudulently mischaracterized parts of the evidentiary record in order to support their position. The Court detects no gamesmanship in the State Defendants' submissions. Parties enjoy wide latitude to present their competing interpretations of the facts on summary judgment without risking sanctions. Ledford may disagree with Defendants' view of the facts, but his disagreement does not mean the State Defendants are lying. His recourse is to argue that Defendants are wrong, which he has done. The motion for sanctions will be denied.

Third, Ledford's responses to Defendants' statements of fact are replete with ill-conceived objections, including, for instance, denials based on his disagreement with the substance of a witness' testimony rather than whether the witness so testified. *See, e.g.*, (Docket #140 ¶ 45). Often, as in his motion for sanctions, he declared that such assertions of fact are misleading or mischaracterize the evidence. They are neither. Nevertheless, out of consideration

## 2.1 The North Cell Hall

The North Cell Hall ("NCH") at GBCI is a long, four-story structure with cells located along its west side on each floor. The NCH is bisected by a firewall between cells A-23 and A-24. The firewall is made from steel and glass and stretches from the floor to the ceiling of the structure. It has a standard double door on the ground floor and a single door on the walkways on the three floors above. *See* (Docket #134-4, #151-1) (photographs of NCH interior). During the relevant period, about 350 prisoners were housed in the NCH.

When Ledford was incarcerated in the NCH, he occupied cell A-26, which is on the ground floor beyond the firewall. Cell A-26 is located directly across from the air intakes, ventilation system, and exterior windows on the east side of the hall. The exterior windows are high up on the wall, across from the third-floor cells. (There are exterior windows on the ground floor, but they are sealed shut.)

## 2.2 The Bathhouse Project

In November 2013, construction began on a new shower facility at GBCI located between the NCH and GBCI's main kitchen. Amy Basten ("Basten"), GBCI's Correctional Services Manager, exercised day-to-day supervision of the project for the prison. SMA Construction Services ("SMA") was hired to build the facility. The bathhouse was positioned such that it directly abutted the east wall of the NCH.

Ledford says the area in which construction took place was "very narrow" and close to the NCH's air intakes. Defendants maintain that this

---

for his *pro se* status and the robust factual record presently before the Court, every effort was made to uncover the true undisputed facts and resolve all reasonable disputes in his favor.

is simply his subjective opinion. However, Ledford provided photographs of the construction site from which it can be inferred that heavy construction equipment was being used in close proximity—sometimes only a few feet—from the air intakes. (Docket #153-1 at 13–20). A diagram of the building project reflects that the space in which construction occurred was only about fifty feet wide. (Docket #109-1). Further, Mike Abhold ("Abhold"), president of SMA, agreed during his deposition that the shower facility was being built in a "fairly narrow corridor." (Docket #153-4 at 38).

Construction work was nearly constant, from 8:00 a.m. to 4:00 or 5:00 p.m. on most days. Workers used heavy machinery and power tools, including a Skytrak forklift, a Bobcat skid loader, a concrete saw, and an excavator, all powered by gasoline or diesel internal combustion engines. (Docket #108 at 10, 13). The forklift and the skid loader were not equipped with exhaust scrubbers, and it is unlikely that the excavator was equipped with one. (Docket #153-3 at 78). Additionally, cement and dump trucks were commonly on-site to provide cement and back-fill, with sometimes as many as thirty trucks arriving in a single day. They idled for 10- to 15-minute periods each, emitting thick exhaust fumes the whole time. Workers also used diesel-powered ground-thawing equipment that operated both during and after working hours. At one point, says Ledford, the ground-thawing machine ran continuously for over a week.

### 2.3    The Exhaust Fumes

Large construction machinery, especially that powered by gasoline or diesel fuel, emits exhaust fumes. The fumes contain carbon monoxide, a colorless, odorless, tasteless gas that is harmful to humans in sufficient concentrations. Because of the proximity of the construction work to the

NCH, exhaust fumes from the construction equipment entered the building through the hall's nearby air intakes. The fumes also entered the NCH even when the air intakes were not being used, due to cracks, gaps, and holes in the building's walls and windows. Ledford contends that the fumes "resulted in an intense odor being present on a nearly daily basis. The fumes were sometimes heavy enough to cause a visible haze in the air." (Docket #158 ¶ 15). The NCH firewall, intended to keep fire and smoke from traveling between the halves of the hall, also had the effect of trapping and concentrating the exhaust fumes at the far end of the hall, between cells A-24 and A-37, where Ledford was confined.

Defendants say that Ledford's assertions concerning the existence and concentration of exhaust fumes are his own lay speculation and are overblown. They admit, however, that "there were odor fumes and occasional visible fume haze during certain parts of the construction period." *Id.* Moreover, as explained below, at the time GBCI officials acknowledged the possibility that exhaust fumes from the construction work were entering the NCH.

### 2.4    Ledford's Symptoms

The NCH inmates were exposed to exhaust fumes for an extended period of time. Ledford says that starting in December 2013, he experienced daily respiratory problems, severe headaches, nausea, burning eyes, a sore throat, one episode of dry heaves, and other symptoms as a result. Other inmates did, too. Defendants dispute whether the fumes caused the prisoners' alleged physical distress, (Docket #158 ¶ 23), (Docket #161 ¶ 23), as Ledford has no opinion from a physician establishing a causal link between the fumes and his ailments, though they admit that his symptoms are consistent with prolonged exposure to carbon monoxide, (Docket #158

¶ 24); (Docket #161 ¶ 24). The parties' competing expert opinions on this topic will be discussed further below. As prisoners, Ledford and his fellow inmates obviously did not have the ability to roam the institution freely to escape the fumes.

### 2.5    The Fume Complaints and Initial Response

In February 2014, Ledford and other NCH inmates began regularly complaining to the correctional officers assigned to the building, Wayne Laufenberg ("Laufenberg") and Todd Zuge ("Zuge"). After hearing many inmate complaints, Zuge, who testified that he himself experienced no ill effects from the fumes despite long shifts in the NCH, asked Scott Leurquin ("Leurquin"), a correctional officer and member of the GBCI Health and Safety Committee, to address the issue. Laufenberg also reported the complaints to his supervisors, though he does not remember precisely who. Ledford also complained directly to Leurquin during his rounds through the NCH. Leurquin performed additional rounds in the NCH around this time, along with other members of the Health and Safety Committee, and no one detected the presence of fumes or any odor. Ledford asserts that this is because their rounds occurred outside construction hours.

Leurquin reported the inmate complaints to Building and Grounds Superintendent Chris Timmers ("Timmers"). Timmers visited the work site daily and was in close contact with the construction crew. It is Department of Corrections ("DOC") policy for Building and Grounds staff to formulate plans to address environmental concerns at Wisconsin prisons. If the staff finds that the institution cannot appropriately address such a problem, it is referred to the Bureau of Budgets and Facilities Management. There are no policies that provide specific steps institutions must undertake to remediate environmental concerns beyond these general directives. *See* (Docket #97).

Inmates next turned to Captain Yana Pusich ("Pusich"), the NCH's security supervisor at that time. Ledford and others wrote to Pusich to complain about the fumes. Ledford's letter of February 4, *see* (Docket #153-3 at 6), received no response. Pusich did, however, relay the complaints to Basten. Pusich did nothing else with respect to the fume issue and did not follow up with anyone as to what had been done.[4]

Basten told Pusich that she would look into it. Basten met with Timmers to discuss the nature of the problem and determine what he thought should be done to address it. He said that in order to mitigate fume entry into the building, staff had shut down the air intakes on that side of the NCH during construction hours. Additionally, staff deployed large air fans on the ground floor to disperse the fumes. He also pointed out to Basten that painting work was being done inside the NCH at the time that might have contributed to the odor. She instructed him to stop the painting. *See* (Docket #153-2 at 107) (email chain with Pusich, Basten, and Timmers).[5]

Thus, in early February 2014, GBCI turned off the air intakes for the NCH and set up large fans on the ground floor. Neither measure was effective, and Ledford reports that a fume haze remained in the NCH until the end of May 2014. As for Ledford and other inmates past the firewall, the fans were particularly unhelpful, as they did little to move the air at that end of the hall.

---

[4]Originally, Ledford complained about the conduct of Cathy Jess ("Jess"), the Administrator for the Division of Adult Institutions, who learned of the fume problem around this time. In connection with his summary judgment submissions, he asked to voluntarily dismiss his claims against her. (Docket #138). That motion will be granted.

[5]Although an important player in the relevant events, Timmers died before this lawsuit was filed, so the parties and the Court do not have access to his own testimony about what he heard, said, and did.

Because of the nature of the NCH's ventilation system, turning off the air intakes simultaneously shut off the heat in the building. Coupled with the fans, this left the NCH intensely cold given the time of year. *See* (Docket #106-1 at 3) (noting that construction work was delayed by "sub-zero temperatures during the winter of 2013 into 2014"). Ledford says that he was forced to wear several layers of clothes just to stay warm, even when going to bed. Inmates thus added complaints of cold to their complaints of fumes when seeking Laufenberg's and Zuge's help. The two officers submitted additional work orders to address the concerns, and Zuge spoke to Leurquin about the problem.[6]

### 2.6    Ledford's Visit with Dr. Sauvey

On February 10, 2014, during a regular visit to discuss his diabetes with Dr. Mary Sauvey ("Sauvey"), a physician at GBCI, Ledford complained about the fumes. She said nothing could be done from a medical standpoint except to remove the source of the fumes. The doctor's notes from that visit do not reflect that the conversation occurred, but Ledford maintains that based on his many years as a state prisoner, he knows that prison doctors rarely write down the topics they discuss with patients.[7]

---

[6]Laufenberg and Zuge told Ledford that they submitted work orders, which Ledford then mentioned in his inmate complaint. The State Defendants' hearsay objection to Laufenberg's and Zuge's statements, (Docket #158 ¶ 42), is without merit, as the two men are employees of the prison who were commenting on a matter within the scope of their employment, Fed. R. Evid. 801(d)(2)(D).

[7]Defendants contend that Sauvey's statements are inadmissible hearsay, but since they came from a prison doctor employed by the State Defendants to opine on medical matters, the Court will accept that she said what Ledford claims she did. Fed. R. Evid. 801(d)(2)(D).

This was the only time Ledford mentioned the fumes to the prison medical staff. One may wonder why, if the fumes were so debilitating for him, he did not seek medical attention related to them before or after this visit with Dr. Sauvey. Ledford explains that he never submitted a formal request for medical attention prior to February 10 because "he did not have to do so. He had routine diabetic passes for check and exams." (Docket #158 ¶ 36). Similarly, he said nothing to anyone in the health services unit after the February 10 visit "because he did not believe that GBCI personnel had any intention of taking any reasonable actions" given their belief—explained further below—that the fumes "did not present a health risk." *Id.* ¶ 37; (Docket #111 at 7) (Ledford testifying that he perceived GBCI officials exhibiting a "flippant, cavalier and indifferent" attitude about his complaints). And, given Sauvey's advice that nothing could be done to treat him for fume exposure, he concluded that further discussion with the medical staff would be futile.

While Ledford apparently did not complain to medical staff about the fumes outside his conversation with Dr. Sauvey, other NCH inmates did so in written healthcare requests. One such inmate, Michael Piester ("Piester"), asked for medical care but was forced to pay a co-pay and was told that he did not present any medical concerns.

Ledford reports that in addition to physical ailments, he suffered severe emotional and psychological harm as a result of prolonged exposure to the fumes; he dreaded returning to his cell to suffer the fumes and felt like he was constantly being poisoned. Further, he was dismayed that Defendants seemed not to care about his plight despite his regular complaints to institution staff, which will be explored further below.

However, he never complained to institution psychological services staff about these problems.

### 2.7 ICRS Complaints, the Martin Investigation, and the Mattison Memorandum

In addition to verbal complaints to correctional officers, Ledford and some of his fellow NCH inmates submitted formal inmate complaints through the institution's Inmate Complaint Review System ("ICRS"), seeking reprieve from the fumes and cold and complaining that the remedial measures taken to date were ineffective. Ledford filed his complaint on February 14, 2014. Another group of NCH inmates, led by prisoner Dwayne Cox ("Cox"), filed a group complaint shortly thereafter, on February 19. Ledford signed his name to the group complaint as well.

A construction project progress meeting was held on February 18. (Docket #153-2 at 16–17) (meeting minutes). The warden, Michael Baenen ("Baenen"), Department of Corrections chief engineer Randall Mattison ("Mattison"), Basten, Timmers, and the Construction Defendants, including Abhold and SMA site supervisor Burt Feucht ("Feucht"), were in attendance. At this meeting, the Construction Defendants were informed of a complaint about the fumes. Avenues for resolution were discussed, and Timmers reported his solution to shut down the air intakes during construction hours. For their part, the Construction Defendants agreed to implement exhaust scrubbers on their heavy equipment to reduce emissions.

After this meeting, Timmers took the lead in ensuring that his proposed solutions were implemented and in monitoring temperature and air quality inside the NCH. Basten and others seemed to rely on his expertise in this area and did little to follow up. They did not determine

what specific steps he took to measure air quality, though Basten testified that Timmers regularly took temperature readings in the hall. A week after the meeting, Feucht says Timmers reported that the problem had been resolved despite inmates' continued malingering.

Mattison also undertook an investigation of the NCH's ventilation system at Baenen and Basten's request, and in response to Ledford's complaint, to ensure that it was working properly. He issued a memorandum on February 20 in which he concluded that the ventilation system, though decades old, was functioning appropriately. (Docket #103-1 at 2–3). He wrote that although diesel exhaust fumes may have entered the NCH during construction, exposure posed no long-lasting health risks and there was significant airflow through the NCH, meaning that dangerous concentrations of fumes would not be expected to build up. *Id.* Mattison also noted that prison maintenance staff, at Timmers' direction, would shut down one or more of the air intakes when construction equipment was being used nearby. *See id.* at 3. Nevertheless, Mattison observed that the Construction Defendants had agreed to use exhaust scrubbers for any equipment in the areas of the air intakes. *Id.*

Defendants submit that OSHA regulations define a carbon monoxide exposure limit of fifty parts per million over an eight-hour work day. (Docket #153-3 at 91). However, Mattison performed no air quality testing, has no medical training, and did not speak with NCH staff or inmates before writing his memorandum. *See id.* His conclusion regarding health risks was premised entirely on Basten's report that there were no fume-related complaints lodged with the medical staff. *Id.* at 28. He did not warn GBCI officials of the dangers of carbon monoxide poisoning as dictated by OSHA or of the recommended abatement steps when

individuals experience symptoms consistent with carbon monoxide poisoning. He did not examine SMA's construction equipment or investigate whether Timmers' attempted fixes for the fume problem were working. (Docket #104 at 12, 16). Further, his investigation of the ventilation system did not involve testing the equipment; he simply reviewed the blueprints and observed the operation of the system in person, noting that the NCH fans "were moving a lot of air." *Id.* at 15.

Basten and Baenen deferred to Timmers' recommendations and Mattison's findings. Neither believed that the fumes presented a health risk to the NCH inmates. As noted above, Basten checked with the health services staff and discovered that no inmate complaints about fumes had been submitted. Ledford claims that their reliance on Mattison's memorandum was unreasonable because his investigation was so obviously deficient. Likewise, they ignored the inmates' complaints that Timmers' proposed solutions were not working. Moreover, Ledford observes that health requests were in fact put in by other NCH inmates about the fumes, including Piester.

Inmates also submitted additional complaints to Pusich about the cold and the continuing fume problem. To one such complaint, Pusich responded on March 2, "It was determined that the fumes do not present a health risk." (Docket #158 ¶ 31). Her response was premised on Mattison's memorandum, forwarded to her by Basten. Pusich did nothing to check Mattison's work or speak to him about the bases for his conclusions.

The GBCI inmate complaint examiner, Joseph Martin ("Martin"), investigated the inmates' ICRS complaints by visiting the NCH on February 18, the same day as the progress meeting. He spoke with Laufenberg and Zuge, who confirmed that Ledford had been complaining of fumes and

cold. He noted that he could smell the fumes and perceive the haze at the end of the hall past the firewall. At the conclusion of his investigation, Martin found that none of GBCI's attempted fixes had resolved the problem of the fumes and that reliance on Mattison's memorandum was faulty as Mattison did not actually address the inmates' concerns. Martin issued his report February 26, recommending to the warden that Ledford's complaint and the group complaint be affirmed.

Baenen did not affirm the complaint. He dismissed it over Martin's recommendation on February 27, asserting that "[t]he professional analysis concludes that there has been no harm done to anyone" which he said was the "crux of the issue." (Docket #110-1 at 10). He did not believe that the mere presence of malodorous fumes or a haze warranted affirmance of the complaint without evidence of harm to inmates or staff. *See id.* Baenen also stated that the prison was "taking steps to minimize the level of the odors." *Id.*

Ledford appealed the dismissal of his ICRS complaint on March 1. On March 5, the corrections complaint examiner ("CCE") recommended to the DOC Secretary that the dismissal be affirmed with a modification that the institution continue the same remedial measures it had been employing. The CCE believed Martin's findings that there were fumes present in the NCH, but likewise believed Baenen that there was no evidence showing serious medical harm to anyone resulting from the fumes or cold.

The DOC deputy secretary, Diedre Morgan, did not accept the CCE's recommendation. On March 21, she affirmed the complaint and directed GBCI to "implement processes to ensure the fumes do not enter the building." *Id.* at 20. Thus, despite Baenen's decision and the CCE's recommendation, in the end Ledford's complaint was found to have merit.

Yet, other than turning off the heat exchanges and deploying air fans, as Timmers recommended, the State Defendants did nothing more to abate the fumes. None recalled ever following up with Timmers regarding specific additional actions taken to fix the problem or confirming that the remedies he proposed were effective.

Baenen defended himself for not implementing further solutions by pointing out that he retired the day the Secretary's decision was issued. Basten testified that staff continued to turn off air intakes during the day. They also considered but did not implement a plan to cover the air intakes from the outside to prevent fume entry. She continued to expect, but did not verify, that the SMA construction workers used exhaust scrubbers on their equipment, as promised at the February 18 progress meeting. Again, much of this inaction was premised on Timmers' expertise and continued monitoring of the situation.

In addition to not implementing additional solutions, Ledford faults the State Defendants for failing to perform air quality testing after receiving inmate complaints. Defendants maintain that because they did not believe that the fumes impacted inmate health, such testing was unnecessary. Ordinarily, air quality testing is only performed in connection with construction projects done in closed spaces, not in the open air. (Docket #158 ¶¶ 89–90). Thus, SMA began performing air quality testing inside the shower facility once it was enclosed by a roof. That testing was not premised on concerns about inmate health but on compliance with policy.

### 2.8    The End of Construction

Ledford complains that the fumes and his resulting health problems persisted until May 2014. At least nine other NCH inmates reported symptoms similar to Ledford's during the project, which they also

attributed to the construction. While Ledford testified that the fumes began to dissipate from the NCH in May 2014, other inmates thought conditions started to improve beginning in late February. (Docket #153-1 at 6). The construction project formally ended in late summer 2014. Ledford admits that he suffered no long-term medical or psychological harm from the fume exposure, (Docket #140 ¶ 32), but maintains that it was a grueling ordeal to endure.

## 2.9   Construction Defendants' Involvement

The Construction Defendants knew generally of the dangers posed by carbon monoxide. Feucht and Abhold had received OSHA training designed to ensure they protected the public and their clients from dangers like carbon monoxide poisoning. The Construction Defendants were aware of the presence of construction fumes at the GBCI work site, but prior to the February 18 progress meeting they appear not to have been concerned with whether those fumes posed a danger to inmates housed in the nearby buildings, including the NCH. In their defense, Feucht testified that before the meeting, there was "zero communication" from GBCI officials about what might be happening inside the NCH. (Docket #90-1 at 6). According to him, they followed general OSHA protocols about site safety.

Abhold testified that the easiest way to determine if a construction site has adequate ventilation is to use common sense. For instance, one would be concerned about dangerous fumes entering a building if the windows were open. But no testing was done to determine if the NCH's air intakes, which were visible from the construction site, allowed fumes to enter. Abhold himself was not regularly present at the work site. The Construction Defendants maintain that air quality monitoring is usually done only for projects occurring in enclosed spaces, as discussed above.

The Construction Defendants knew nothing of inmates' fume complaints until the February 18 meeting. (Docket #161 ¶¶ 79, 98). As noted above, at that juncture—according to Mattison and Basten—they agreed to use additional exhaust scrubbers on equipment near the air intakes. GBCI officials also expected the company to consider covering the air intakes for the NCH. The Construction Defendants ultimately did neither, since the following week Feucht heard from Timmers that Timmers' solutions had abated the problem. (Docket #90-1 at 9). The Construction Defendants also had no way to know the structure or function of the NCH's ventilation system; only GBCI officials had that knowledge. *Id.* at 13.

### 2.10  Expert Opinions

Dr. Kim Anderson ("Anderson"), a toxicologist who performs occupational and environmental safety analyses, was retained by plaintiff's counsel in the Cox action to opine on whether Cox's alleged symptoms were consistent with carbon monoxide poisoning. (Docket #106-1 at 1). Anderson noted that the NCH's ventilation system brought in 45–100% of the outdoor air depending on the outside air temperature. *Id.* at 4. For that reason, and in light of the prisoner and officer complaints of exhaust fumes, as well as Martin's report, he reasoned that it was "feasible" that carbon monoxide entered the NCH during construction. *Id.* at 12. He offered no opinion concerning the actual exposure NCH inmates suffered since no contemporaneous air quality testing was ever done, and he did not evaluate the effect temperature would have on fume entry. *Id.*; (Docket #106 at 12, 15–16). Further, he opined that Cox's reported symptoms were "likely" the result of carbon monoxide poisoning, which presents with headache, dizziness, upset stomach, vomiting, chest pain, and confusion. (Docket #106-1 at 14). Anderson faults GBCI officials for not appreciating the

dangers posed by potential carbon monoxide poisoning and their failure to ever conduct air quality testing to determine whether carbon monoxide was building up inside the NCH. *Id.* at 13–14.[8]

Defendants counter that at his deposition, Anderson backtracked. He testified that he does not provide opinions on medical causation, stating that "[a]s a toxicologist, I do not provide opinions on causation; rather, I would use a differential diagnosis when such is provided and then evaluate the risk associated with an exposure and whether that risk is elevated as related to the diagnosis that has been made." (Docket #106 at 9). In other words, he took Cox's and the other inmates' reported symptoms at face value and assessed whether exposure to the exhaust fumes elevated the risk of those symptoms. *Id.* at 9–10, 12–13, 20. The fact remains, however, that Anderson did offer an opinion that the inmates' reported symptoms, if true, were consistent with and likely caused by carbon monoxide exposure emanating from the construction work. *Id.* at 19–20, 22. He discounted

---

[8]As noted above, Ledford was permitted to use discovery materials gathered in the Cox litigation. *See supra* note 2. In his mind, that meant that Anderson's causation opinion was just as applicable to him as Cox. *See* (Docket #106-1 at 14). Defendants disagree, noting that while Ledford was allowed to use Cox's discovery, he cannot modify an expert's opinion to suit his needs. (Docket #174). Seeing this theme in their summary judgment submissions, *see* (Docket #158 ¶ 119), Ledford filed a "motion to clarify," asking the Court for guidance as to whether it was appropriate to substitute himself in Cox's place when referring to Anderson's report. (Docket #172); (Docket #158 ¶ 119) (Ledford inserted his name when quoting Anderson report). This is, of course, not appropriate, but Anderson's opinions about carbon monoxide exposure broadly cover Cox's complaints, Ledford's complaints, and those of other NCH inmates. *See* (Docket #106-1 at 4–9). Thus, while Ledford cannot simply insert his name into Anderson's report where Cox's name appears, he can argue that Anderson's opinions reach his reported symptoms, which they clearly do. As a result, the motion to clarify must be denied but the Court's view of the evidence turns out in Ledford's favor.

defense counsel's alternative theory that perhaps the inmates all came down with the flu or allergies at once. *Id.* at 20.

The State Defendants retained Susan Evans, a certified industrial hygienist, to review materials from the Cox case and evaluate the potential causal connection between the construction work and his alleged symptoms. (Docket #90-3). She opined first that it is not possible to presently reconstruct the emissions from the work site, as the emission levels are affected by many environmental variables like temperature, fuel type, the machine in question, and other factors. Similarly, emission concentration levels in the NCH cannot be reconstructed, either, because of the variability of emission levels, air intake flow rates, temperature, and other factors. Evans opined that Cox's symptoms "are potentially related to carbon monoxide or other diesel or gasoline fueled emissions, or may be related to circumstances not related to the emissions at all," since his complaints were "non-specific and could have been caused by exposure to any number of things" or some unrelated illness. *Id.* at 6. In the end, her opinion is that the cause of his symptoms cannot be shown more likely than not to be construction-related. *Id.* Ledford attests that at no time has he had any allergies, other than to the drug methadone, nor did he have the flu or a cold at the times relevant to the complaint.

**3.    ANALYSIS**

Ledford makes two distinct sets of claims in this case. First is his allegation that the State Defendants violated his rights under the Eighth Amendment by acting with deliberate indifference to the danger posed by the exhaust fumes and the cold temperatures in the NCH. *See* (Docket #7 at 7–8). Second, Ledford asserts state law negligence and negligent infliction

of emotional distress claims against both the State and Construction Defendants.

The Court will address the constitutional claims arising from noxious fumes and cold temperatures first. Then it will discuss the state law negligence claims. Because the evidence does not present an issue of fact as to the standard of care, the Court will not reach causation. Finally, the Court will discuss the application of immunity to the State Defendants for the negligence claims.

### 3.1    Conditions of Confinement Claim

The Supreme Court has interpreted the Eighth Amendment as requiring a minimum standard for the treatment of inmates by prison officials: prison conditions must not, among other things, involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). An inmate's constitutional challenge to the conditions of his confinement has two elements. *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004).

First, he must show that the conditions at issue were "sufficiently serious" so that "a prison official's act or omission. . .result[s] in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). Prison conditions may be "harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). The Eighth Amendment "does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). Rather, "extreme deprivations are required to make out a conditions-of-confinement claim."

*Turner v. Miller*, 301 F.3d 599, 603 (7th Cir. 2002) (citations and quotations omitted); *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

Second, even if conditions were sufficiently severe, the prisoner must also demonstrate that prison officials acted with "deliberate indifference" to the risk created by those conditions. *Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Whitman*, 368 F.3d at 934. "Deliberate indifference" means that the official knew that the inmate faced a substantial risk of serious harm from the condition in question, and yet disregarded that risk by failing to take reasonable measures to address it. *Farmer*, 511 U.S. at 847; *Johnson v. Phelan*, 69 F.3d 144, 149 (7th Cir. 1995); *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008) (deliberate indifference arises when prison officials "ac[t] with the equivalent of criminal recklessness") (citations and quotations omitted). It is not enough for the inmate to show that the official acted negligently or that he or she *should* have known about the risk. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996). Instead, the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference. *Pierson*, 391 F.3d at 902. That is, "a plaintiff must establish that the official knew of the risk (or a high probability of the risk) and did nothing." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). In the end, it is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by [the Eighth Amendment.]" *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold" of constitutional protections).

### 3.1.1    Noxious Fumes

#### 3.1.1.1    Sufficiently Serious Condition

While the Eighth Amendment may not guarantee inmates "more salubrious air" than is enjoyed by free Americans, it does protect inmates from noxious air. *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (holding that intense exposure to environmental tobacco smoke could constitute an "unreasonable risk of serious damage" to an inmate's health under the Eighth Amendment); *Board v. Farnham*, 394 F.3d 469, 486 (7th Cir. 2005) (holding that allegedly inadequate ventilation system constituted an objectively serious harm in violation of the Eighth Amendment). It is undisputed that there were fumes and haze in the NCH caused by the construction. It is only disputed whether the nature and concentration of these fumes and haze constituted a sufficiently serious risk to Ledford's health. To this point, the parties duel over the credibility of risk assessments. Should a factfinder believe Martin, the rogue, overzealous complaint examiner, or Mattison, the engineer with no ability to assess risk to inmate health who performed a cursory investigation? (Docket #102 at 6); (Docket #99-2 at 3).

The Court will not engage in weighing evidence or judging the credibility of the risk assessments at this stage. Construing the evidence in Ledford's favor, as is required at summary judgment, a reasonable jury could find that Ledford's exposure to these fumes constituted a sufficiently serious condition of confinement in violation of the Eighth Amendment.

#### 3.1.1.2    Deliberate Indifference

The State Defendants must also have acted with deliberate indifference, which, at minimum, requires "*actual* knowledge of *impending* harm *easily* preventable.'" *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir.

1992) (quoting *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985) (adding emphasis)). "[I]f the officials don't know about it or can't do anything about it, the subjective component is not established and the suit fails." *Id.* The question, then, is whether a reasonable jury could conclude that the State Defendants knew the risk of harm and chose not to mitigate the risk. *See Farnham*, 394 F.3d at 486–87 (affirming denial of summary judgment in light of evidence that a heating contractor/inspector told the defendant that the ventilation system was inadequate and unhealthy, and the defendant still chose not to clean or replace it).

Here, there is no evidence that any State Defendant acted with actual knowledge of the risk of harm and deliberately chose to ignore the risk. Each named defendant's subjective intent will be examined below.

Leurquin was a correctional officer and member of the Health and Safety Committee who conducted several rounds through the NCH. During these rounds, he did not observe the fumes in the NCH, and therefore did not believe there was a risk of harm. Nevertheless, in light of the inmates' complaints, he reported the issue to Timmers, who was the official best positioned to address such environmental concerns. Leurquin did not demonstrate deliberate indifference to the risk of toxic fumes because he acknowledged the inmates' complaints (despite not perceiving the risk himself) and reported the complaints to the appropriate official. *See e.g.*, *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (finding no Eighth Amendment violation where a prison official "investigated the complaints and referred them to the medical providers who could be expected to address [the] concerns.").

Pusich was the NCH's security supervisor, and received several complaints from Ledford and other inmates regarding the fumes. While

Pusich did not respond to all of the complaints or follow up to ensure they were resolved, she did relay the complaints to Basten, who assured Pusich that she would look into the issue. Pusich later received Mattison's memorandum from Basten, which concluded that there was no risk of harm. Pusich continued to receive complaints from inmates even after the issue was ostensibly resolved. However, Pusich relied on Mattison's memorandum, and believed that even if the fumes were present, there was no risk of harm. There is no evidence that Pusich had actual knowledge of the risk and chose to ignore it—to the contrary, she forwarded the complaints to appropriate parties and was assured that there was no risk of harm.

Basten was GBCI's Correctional Services Manager and in charge of supervising the day-to-day operations of the bathhouse project. She arranged to meet with Timmers after learning about the complaints. Timmers told her that shutting down the air intakes on that side of the NCH during construction hours, and deploying large air fans on the ground floor to disperse the fumes, addressed the issue. Timmers also noted that a painting project may have contributed to the odor. Basten instructed a halt to the painting. By early February, GBCI had turned off the air intakes and set up large fans on the ground floor. At a construction progress meeting on February 18, Basten further discussed how to mitigate the fumes. Basten and Baenen also asked Mattison to investigate the NCH's ventilation system to ensure that it worked properly. Basten relied on Timmers and Mattison to evaluate the problem and carry out their proposed solutions. Mattison deduced no risk of harm in light of the functioning ventilation system, and Timmers assured her that his solutions to shut off air intakes and use fans had solved the problem. Accordingly, Basten believed that the

fumes had abated, and, in any case, that there was no risk of harm. The evidence shows that Basten responded promptly to complaints and attended to the situation throughout February, delegating investigative tasks, exploring solutions, and relying on the conclusions of those with expertise. There is no evidence that Basten acted with actual knowledge of a risk of harm to the inmates and deliberately ignored that risk.

Baenen, the warden, worked with Basten to address the complaints. Together, they requested that Mattison inspect the ventilation system to ensure that it was working properly. Based on Mattison's conclusions, Baenen, too, believed that there was no risk of harm. However, at the end of February, Baenen received Martin's report, which indicated that the attempted fixes had not worked. Martin recommended affirming Ledford's complaint. Instead, Baenen rejected Martin's recommendation in favor of Mattison's conclusion. But Baenen's professional decision to adopt one competent employee's report over another does not give rise to deliberate indifference. *C.f. Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (discussing medical professional's deliberate indifference). This is not a case where Baenen "disregarded rather than disagreed" with an expert and chose a path that departed "radically" from "accepted professional practice." *See id.* at 803, 805. Rather, Baenen considered the reports and elected to rely on his chief engineer's conclusion. Baenen's choice was corroborated when Ledford appealed Baenen's decision and the CCE agreed with Baenen that there was no risk of harm despite the presence of fumes. Moreover, Baenen's reliance on Mattison's conclusion must be considered in light of the fact that one of his correctional officers who spent long shifts in the NCH, Zuge, never experienced any symptoms. It cannot be said, then, that

Baenen acted with awareness of a risk of harm and deliberately chose to do nothing—indeed, he had reason to believe there was no risk of harm.

Mattison, the chief engineer, examined the ventilation system and concluded that there was no risk of harm because the ventilation system was working and there was significant airflow through the NCH. Despite his expertise, there are a number of shortcomings in his investigation. His conclusions about the health risks were based on the lack of fume-related complaints with the medical staff. He did not warn GBCI correctional officials of the dangers of carbon monoxide poisoning, nor did he follow the abatement steps recommended by OSHA when individuals experience $CO_2$ poison symptoms. He did not conduct any test of air quality, spend any significant time in the NCH, or speak with the staff or inmates. Indeed, he did not actually test the ventilation equipment, he simply reviewed blueprints and saw them in action.

The record as to Mattison is rife with evidence of potentially unreasonable conduct. However, unreasonable conduct does not give rise to liability under the Eighth Amendment. *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 988 (7th Cir. 1998) (observing that deliberate indifference "is more than negligence and approaches intentional wrongdoing."). There is no evidence that Mattison acted with actual knowledge of the risk of harm, or that his response to the risk of harm was "so plainly inappropriate" as to permit the inference that he acted with intentional or reckless disregard to Ledford's needs. *See Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

### 3.1.2    Cold Temperature

### 3.1.2.1    Sufficiently Serious Condition

Extreme cold is also a sufficiently serious condition that may give rise to an Eighth Amendment violation. *Gray v. Hardy*, 826 F.3d 1000, 1005

(7th Cir. 2016); *Haywood v. Hathaway*, 842 F.3d 1026, 1030 (7th Cir. 2016). In *Haywood*, the Court found a sufficiently serious condition of confinement where an inmate attested to freezing temperatures caused by a broken window, a power failure, and prison guards who made the cold worse by turning on fans and refusing to provide adequate clothing and blankets. *Id.*

There is indisputable evidence that the NCH was intensely cold in the winter of 2013-2014, when the area was stricken by a "polar vortex" that caused temperatures to plummet below zero. Ledford claims that this cold was worsened by the ventilation fans and air intake shut-off. However, there is no evidence that Ledford suffered an unconstitutional degree of cold. He had additional layers of clothing to wear to bed, and there is no evidence that he was denied additional clothing and blankets necessary to stay warm. There are no allegations that windows were left open, or that the heat exchanges were turned off twenty-four hours per day. Accordingly, there is insufficient evidence to show a genuine issue of fact as to the objective seriousness of this condition, and summary judgment is properly granted. *See Benson v. Godinez*, 919 F. Supp. 285, 289 (N.D. Ill. 1996) (granting summary judgment where defendant received additional clothing and blankets to compensate for a cold cell); *Scott v. Russell*, 175 F. Supp. 2d 1099, 1103 (N.D. Ill. 2001) (finding no Eighth Amendment violation where temperature readings showed that the heating system functioned adequately and Plaintiff was provided with several blankets and taped windows for added insulation). Moreover, even if Ledford had demonstrated a sufficiently serious condition, there is no evidence of deliberate indifference in light of the fact that Timmers began monitoring the temperature in the NCH. *Id.*; *c.f. Jordan v. Milwaukee Cty.*, 680 F. App'x 479, 482–83 (7th Cir. 2017) (denying summary judgment where prison

officials received multiple grievances yet took no mitigating action for two consecutive winters).

### 3.2 Negligence Claims

#### 3.2.1 Construction Defendants

In Wisconsin, the elements of a negligence claim are: "(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Antwaun A. v. Heritage Mut. Ins. Co.*, 596 N.W.2d 456, 461 (Wis. 1999). The duty in this case would be one of reasonable or ordinary care, which is defined as the care "which a person of ordinary prudence would exercise under the same or similar circumstances." *Schuldies v. Serv. Mach. Co., Inc.*, 448 F. Supp. 1196, 1199 (E.D. Wis. 1978). Notably, Wisconsin has adopted the Andrews approach to duty, *see Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 102 (Ct. App. N.Y. 1928) (Andrews, J., dissenting), holding that "[t]he duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act," *A.E. Inv. Corp. v. Link Builders, Inc.*, 214 N.W.2d 764, 766 (Wis. 1974); *Klassa v. Milwaukee Gas Light Co.*, 77 N.W.2d 397, 401 (Wis. 1956). Thus, negligence arises when "it can be said that it was foreseeable that [the defendant's] act or omission to act may cause harm to someone." *Rolph v. EBI Cos.*, 464 N.W.2d 667, 672 (Wis. 1991) (citations and quotations omitted). Yet, while Wisconsin has adopted the view that "everyone owes a duty to the world at large, the duty owed to the world is not unlimited but rather is restricted to what is reasonable under the circumstances." *Hocking v. City of Dodgeville*, 768 N.W.2d 552, 556 (Wis. 2009).

In this case, Ledford charges the Construction Defendants with dereliction of their duty of care toward prisoners who foreseeably could be harmed by the exhaust fumes emanating from the construction equipment. The duty has several aspects that must each be considered. First, there is the theory that the Construction Defendants should have used exhaust scrubbers on all of their equipment and should have used the heaviest equipment less frequently. But without some notice that the fumes were entering the NCH, there would be no reason to suspect that harm could result from the exhaust fumes. Such fumes regularly spill into the open air without harming anyone. Although GBCI officials placed the Construction Defendants on clear notice of the fume problem at the February 18 meeting, a week later Timmers told Feucht that the ventilation and air supply solutions had abated the problem—thereby taking them "off notice," so to speak.

This brings the Court to the next theory: that the Construction Defendants had notice of the danger that fumes were entering the NCH because of the proximity between the work site and the air intakes and heat exchanges. Here, Ledford theorizes that the construction workers and their supervisors, being trained in construction, should have perceived the likelihood that exhaust fumes would be sucked into the building through the nearby vents and exchanges. This theory, that the Construction Defendants had a duty to people housed in nearby buildings to mitigate harmful fumes, requires more in-depth treatment.

### 3.2.1.1   Standard of Care

Whether the Construction Defendants breached their duty of care to people in nearby buildings requires an "assessment of what ordinary care requires under the circumstances." *Hocking*, 768 N.W.2d at 556 (citations

and quotations omitted). The need for expert testimony to establish the standard of care depends on the negligence alleged—experts are required for "those matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study or experience." *Payne v. Milwaukee Sanitarium Found., Inc.*, 260 N.W.2d 386, 392 (Wis. 1977); *Shadday v. Omni Hotels Mgmt. Corp.*, 477 F.3d 511, 518 (7th Cir. 2007) (granting summary judgment in favor of defendant where "plaintiff failed to present enough evidence to establish a genuine issue concerning the sufficiency of the care exercised by the hotel to protect its guests"); *Lees v. Carthage College*, 714 F.3d 516, 522 (7th Cir. 2013) (applying Wisconsin law and finding an abuse of discretion in failing to admit expert testimony from campus security professional, which was necessary to establish standard of care); *Atl. Specialty Ins. Co. v. United States*, 2017 WL 3822057, at *5–6 (W.D. Wis. Aug. 30, 2017) (holding that a plaintiff's claim failed as a matter of law where he offered no expert testimony regarding the proper placement of drainage basins in a parking lot).

Plaintiff has not offered expert testimony that establishes the standard of care for the Construction Defendants, but argues that the question of breach is one for the jury. Yet the standard of care on construction sites is beyond the knowledge of the ordinary citizen, and an expert would be needed to opine whether following general OSHA protocols about site safety, as Feucht testifies, is sufficient to meet the standard of care. For example, an expert would be needed to determine whether it is a breach of duty to fail to test air intakes in a neighboring building where the windows are not open; whether air quality monitoring is needed on a site like the one in question, which, though narrow, was

open-air and open on one side; whether the generators and exhaust-emitting machines were positioned appropriately in the open-air corridor; and whether the Construction Defendants used a suitable number of exhaust scrubbers for the area in question. None of this is within the knowledge of the average juror, and yet it is necessary to demonstrate that the Construction Defendants breached the standard of care.

Ledford offers no evidence in support of whether the Construction Defendants in this case breached the standard of care. He merely says that they should have known that the people in NCH were exposed to harmful fumes, and that the Construction Defendants were put on notice of the fumes. But construction sites have many fumes that emanate from machinery, building materials, and tool use, and not all of these fumes are noxious. Construction Defendants, on the other hand, offered Feucht, the SMA site supervisor, who testified to the sufficiency of OSHA practices to protect the general public, and Abhold, president of SMA, who testified that he was unconcerned about dangerous fumes permeating the building in part because no windows on the ground floor were open. The Construction Defendants stated that air quality monitoring is usually done only for projects occurring in enclosed spaces, such as the shower facility once it had a roof. There is no evidence that the NCH corridor, which, while relatively narrow, was low-rise, open air, and open on one wall, was the sort of space that required air testing. There is no evidence that the Construction Defendants were required to use exhaust scrubbers for certain machines in semi-enclosed spaces—only that they offered to use them when they heard about the complaints, and ultimately did not use them because they were assured by GBCI that the issue was resolved. No jury would have any basis for determining, without expert testimony, whether

this was a breach of the standard of care. *See Atl. Specialty*, 2017 WL 3822057, at *5. Plaintiff has not offered any such evidence. Accordingly, summary judgment must be granted in the Construction Defendants' favor. *Id.*

### 3.2.1.2   Negligent Infliction of Emotional Distress

A claim for negligent infliction of emotional distress ("NIED") must satisfy the traditional negligence tort elements of conduct, causation, and injury, and not be otherwise barred by public policy. *Bowen v. Lumbermens Mut. Cas. Co.*, 517 N.W.2d 432, 442–43 (Wis. 1994); *Camp ex rel. Peterson v. Anderson*, 721 N.W.2d 146, 152 (Wis. Ct. App. 2006). The emotional injury sustained must be "severe." *Hicks v. Nunnery*, 643 N.W.2d 809, 818 (Wis. Ct. App. 2002) (requiring plaintiff to "demonstrate that he was unable to function in his other relationships because of the emotional distress caused by defendant's conduct.") (citations and quotations omitted).

Ledford has not produced any evidence that would allow a reasonable jury to infer that the Construction Defendants breached the standard of care. Because there is no evidence of this conduct, summary judgment must be granted in favor of the Construction Defendants. *See Jackson v. United Migrant Opportunity Serv.*, 326 Wis.2d 265 ¶¶ 12–13 (Ct. App. May 25, 2010) (unpublished) (upholding summary judgment grant in NIED claim where plaintiff failed to show that defendants' conduct violated the standard of care).

### 3.2.1.3   Negligent Supervision Claim

Construction Defendants argue that Ledford's claim for negligent supervision must be dismissed because it is duplicative of the other negligence claims brought against them. Negligent supervision is an actionable tort in Wisconsin where "the failure of the employer to exercise due care was a cause-in-fact of the wrongful act of the employee that in turn

caused the plaintiff's injury." *Miller v. Wal-Mart Stores, Inc.*, 580 N.W.2d 233, 238 (Wis. 1998). The few Wisconsin courts to consider the issue appear to find negligent supervision distinct from general negligence, and therefore not duplicative. *See Hansen v. Texas Roadhouse, Inc.*, 827 N.W.2d 99, 108 (Wis. Ct. App. 2012) (treating the two causes of action as distinct and holding that a jury's affirmance of punitive damages in a negligent supervision action did not imply a cause of action for general negligence, which was never submitted to the jury); *see also John Doe 1 v. Archdiocese of Milwaukee*, 734 N.W.2d 827, 837–38 (Wis. 2007) (holding that, for statute of limitations purposes, negligent supervision is a derivative claim arising from general negligence, but not foreclosing both). As discussed above, Ledford has failed to provide evidence that any Construction Defendant breached the standard of care. Accordingly, there is no evidence to sustain the negligent supervision claim. Put another way, there is no evidence that SMA breached the standard of care and that breach was the cause-in-fact of Feucht, Abhold, and the other construction workers' allegedly wrongful acts that resulted in Ledford's injury. *Miller*, 580 N.W.2d at 238–39. Therefore, Construction Defendants are entitled to have summary judgment granted in their favor on the negligent supervision claim.

### 3.2.2 State Defendants

Assuming that Ledford could establish the State Defendants' negligence on the same facts and theories as the Construction Defendants, his claims nevertheless fail because the Wisconsin state officials, unlike the Construction Defendants, are entitled to discretionary immunity under Wisconsin common law.

State officials are immune from liability for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Wis.

Stat. § 893.80(4). Wisconsin courts have interpreted this protection as extending to all conduct involving "the exercise of discretion and judgment." *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, 677 (Wis. 2005) (quotation omitted). A "discretionary duty" requires "a public official to determine how a general policy should be carried out or how a general rule should be applied to a specific set of facts." *Patterson v. Hepp*, 2017 WL 3261517, at *12 (E.D. Wis. July 31, 2017) *aff'd*, 722 F. App'x 585 (7th Cir. 2018) (citing *Lifer v. Raymond*, 259 N.W.2d 537, 541 (Wis. 1977)). Wisconsin courts have recognized four categories of acts to which immunity does not apply: "(1) ministerial duties imposed by law, (2) duties to address a known danger, (3) actions involving professional discretion, and (4) actions that are malicious, willful, and intentional." *Scott v. Savers Prop. & Cas. Ins. Co.*, 663 N.W.2d 715, 721 (Wis. 2003). The immunity afforded by Section 893.80(4) and the exceptions thereto represent "a judicial balance struck between 'the need of public officers to perform their functions freely [and] the right of an aggrieved party to seek redress.'" *C.L. v. Olson*, 422 N.W.2d 614, 617 (Wis. 1988) (quoting *Lister v. Bd. of Regents of Univ. of Wis. Sys.*, 240 N.W.2d 610, 621 (Wis. 1976)); *Patterson*, 2017 WL 3261715, at *11.

The parties agree that the only exception at issue is whether there was a known and compelling danger. (Docket #143 at 57); (Docket #157 at 13–14). The known-danger exception, similar to the ministerial exception, applies in instances where "there exists a known present danger of such force that the time, mode and occasion for performance [are] evident with such certainty that nothing remains for the exercise of judgment and discretion." *Lodl v. Progressive N. Ins. Co.*, 646 N.W.2d 314, 324 (Wis. 2002) (quotation omitted). In other words, the danger must be an "accident

waiting to happen." *Heuser ex rel. Jacobs v. Comm. Ins. Corp.*, 774 N.W.2d 653, 659 (Wis. Ct. App. 2009) (quotation omitted). The circumstances must be "sufficiently dangerous so as to give rise to a ministerial duty—not merely a generalized 'duty to act' in some unspecified way, but a duty to perform the particular act upon which liability is premised." *Lodl*, 646 N.W.2d at 324 (emphasis added). Put differently, the official must have failed to make a particularized response that was required under the circumstances presented. *Heuser*, 774 N.W.2d at 660. The choice of remedy is within the official's discretion and is therefore shielded by immunity under Section 893.80(4). *Id.* Only by doing nothing in response to a known and sufficiently severe danger will the official open himself to liability. *Id.* at 662.

Here, there is no evidence that the inmates' exposure to the construction site was an "accident waiting to happen," or that any of the State Defendants failed to respond to the facts presented. *Id.* at 659–60. Indeed, as detailed in Section 3.1.1.2 above, each defendant took at least one and often several steps to resolve the fumes complaint, however unsatisfactory the ultimate resolution was to Ledford. The Building and Grounds staff formulated and carried out plans to remediate the fumes issue, including checking the ventilation system, using fans, and turning off the heat exchange during construction. The other State Defendants investigated the complaints, agreed on corrective measures, and made decisions about whether to take additional remedial measures based on reports from the Building and Grounds Superintendent. They did not simply do "nothing" in response to the complaints. *Patterson*, 2017 WL 3261715, at *13. Discretionary immunity is therefore appropriate under these circumstances.

### 4. CONCLUSION

Viewing the record evidence in the light most favorable to Ledford, the Court is constrained to grant summary judgment to all Defendants. Both motions for summary judgment must therefore be granted and this case dismissed with prejudice.

Accordingly,

**IT IS ORDERED** that the Construction Defendants' motion for summary judgment (Docket #86) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the State Defendants' motion for summary judgment (Docket #94) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the State Defendants' motion to seal one of their summary judgment exhibits (Docket #135) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to dismiss Defendant Cathy Jess (Docket #138) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Cathy Jess be and the same is hereby **DISMISSED** from this action;

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to exceed the page limit for his legal briefs (Docket #139) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for sanctions (Docket #147) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file supplemental exhibits (Docket #151) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to strike the Construction Defendants' supplemental proposed findings of fact (Docket #167) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to clarify (Docket #172) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of March, 2019.

BY THE COURT:

J. P. Stadtmueller
U.S. District Court